jano 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 




NO. 3-91-307-CV




MARTIN JANO,



 APPELLANT


vs.





STATE OF TEXAS AND STATE BOARD OF INSURANCE,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT



NO. 477,507, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING



 




 The court below found that it had in personam jurisdiction over Martin Jano and
assessed civil penalties against him for unauthorized sale of insurance. See Tex. Ins. Code Ann.
art. 1.14-1, § 3 (Supp. 1992). Jano appeals. We will affirm the judgment of the trial court.



THE CONTROVERSY


 Jano was the president of two liability insurance companies, Casualty Assurance
Risk Insurance Brokerage Company ("CARIB"), a company incorporated in 1986 in Guam, and
CARIB's successor corporation, Trans-Pacific Insurance Company ("Trans-Pacific"), incorporated
in 1989 in the Federated States of Micronesia. (1) The Companies, (2)
 which sold medical malpractice
insurance to physicians, solicited business by advertising in national medical journals. If a Texas
physician saw the advertisement and requested information about insurance coverage, the
Companies sent information to the physician pursuant to the request. Neither of the Companies
ever had agents or brokers in Texas, and they did not have an office or own property in Texas. 
Jano or another representative of the Companies executed the insurance contract outside the State
of Texas. Under article 1.14-1, section 2 of the Insurance Code, the foregoing amounted to
"doing an insurance business" in Texas. See Tex. Ins. Code Ann. art. 1.14-1, § 2 (Supp. 1992).

 In 1987 CARIB applied for a license to sell surplus-lines insurance in Texas. The
State Insurance Board (the "Board") denied the application because CARIB did not verify its
financial information. A CARIB representative assured the Board that the Company would not
sell insurance in Texas until it was able to comply with the Board's requirements. Nevertheless,
CARIB continued without authority to sell insurance to Texas residents in the manner described. 
See Tex. Ins. Code Ann. art. 1.14-1, §§ 2, 3 (Supp. 1992).

 In November 1989 the Board determined that CARIB was selling insurance in
violation of article 1.14-1 of the Insurance Code and therefore was committing deceptive trade
practices in violation of article 21.21 of the Insurance Code. See Tex. Ins. Code Ann. art. 21.21
(1981 & Supp. 1992). The Board issued to CARIB a cease-and-desist order, which provided for
civil penalties if CARIB did not comply with the order. See Tex. Ins. Code Ann. art. 1.14-1,
§ 3A (Supp. 1992).

 On January 11, 1990, the State of Texas applied for and obtained a temporary
restraining order prohibiting CARIB, Jano and other affiliated entities from conducting
unauthorized insurance business in Texas. Neither Jano nor any other CARIB representative
appeared at the subsequent hearing on the State's application for temporary injunction, and the
district court granted the requested relief: The court ordered Jano and CARIB each to deposit
with the court $1,500,000 in cash or bond within ten days or face contempt charges, and the court
prohibited their transacting unauthorized insurance business in Texas. Neither Jano nor CARIB
ever posted a bond. The court also set a hearing for a permanent injunction.

 Between the time the district court issued the temporary injunction and the time set
for the hearing on the permanent injunction, the State attempted to discover the location and extent
of CARIB's assets. Jano refused to appear for depositions and CARIB refused to produce
requested documents. CARIB also objected to the State's interrogatories. The State obtained an
order requiring CARIB to submit in part to the discovery requests. Nevertheless, Jano and
CARIB continued to resist discovery, and, in fact, obtained an order staying discovery while they
pursued mandamus relief in this Court. (3)

 In April 1990 the Board apparently learned that CARIB had reincorporated in
Micronesia as Trans-Pacific. The Board issued to Trans-Pacific a cease-and-desist order identical
to the earlier order affecting CARIB. Despite these orders, Jano continued to execute applications
for insurance from Texas physicians and Trans-Pacific continued to accept premiums.

 After amending its original petition to join Trans-Pacific as a defendant, the State
applied for and obtained a temporary restraining order prohibiting Trans-Pacific from engaging
in unauthorized insurance transactions. On July 9, 1990, the district court signed a temporary
injunction order directing Trans-Pacific to place into the registry of the court within ten days all
premium dollars or other assets received from Texas insureds. In a later hearing the State also
persuaded the district judge to lift the discovery stay.

 On August 24, 1990, the district court ordered Jano to appear before the court to
show why he should not be held in contempt for disobeying the temporary restraining order and
the temporary injunction order. In particular, Jano had allegedly disobeyed the orders by refusing
to deposit the premium monies in the court registry and by continuing to execute insurance
policies written for Texas physicians. Jano did not appear at the scheduled hearing. The court
reset the hearing and issued an order of attachment for Jano's arrest. Before the next scheduled
hearing, however, Jano's father died and the court postponed the hearing at his request until April
1, 1991.

 In September 1990, CARIB, Trans-Pacific and Jano made special appearances to
contest the jurisdiction of Texas courts over them. The district court overruled their contentions.

 The Companies and Jano continued to resist discovery requests. The State filed
its fifth motion to compel on November 21, 1990, alleging in its motion that CARIB, Trans-Pacific and Jano had not obeyed the court's earlier discovery orders. The State requested that,
as a discovery sanction, the defendants' pleadings be struck and final judgment be entered against
them. On November 28, 1990, the district court granted the motion, thereby deeming all facts
and causes of action admitted as a matter of law against the Companies and Jano. The court
rendered final judgment in May 1991, assessing a $100,000 civil penalty against Jano, along with
a $1,000,000 penalty against the Companies.

 The Companies and Jano appealed from the judgment. While the appeal was
pending, the Companies went into receivership and the receiver settled the suit with the State of
Texas. Therefore, we address only the points of error relevant to Jano's appeal. (4)



DISCUSSION


In Personam Jurisdiction


 Jano complains first that the trial court erred in finding it had in personam
jurisdiction over him because (1) he signed the agreements only in his capacity as president of the
Companies, not in his personal capacity, and (2) his execution of the insurance contracts
constituted insufficient contacts for Texas courts constitutionally to exercise jurisdiction over him. 
We disagree with Jano's contentions.






Fiduciary Shield Doctrine


 According to Jano, the "fiduciary shield" doctrine provides that "acts performed
by a person in his capacity as a corporate fiduciary may not form the predicate for the exercise
of jurisdiction over him in his individual capacity." Jano asserts that a corporation's solicitation
of business cannot be imputed to individual employees, thereby making them amenable to suit in
the forum state.

 A court should not judge an employee's contacts with a forum by the employer's
activities in that forum. Calder v. Jones, 465 U.S. 783, 790 (1984). Nevertheless, the defendant
employee's status as an employee does not necessarily shield him from jurisdiction. Id. Each
defendant's contacts with the forum state must be assessed individually, and if the individual is
a primary participant in wrongdoing intentionally directed at residents of a particular forum,
jurisdiction over the individual is proper on that basis. Id.; see Donovan v. Grim Hotel Co., 747
F.2d 966, 973-74 (5th Cir. 1984).

 We believe Jano was shown to be a primary participant in wrongdoing intentionally
directed at Texas residents. He testified he was in charge of assuring that the Companies' policies
complied with the applicable laws of the individual states. Yet Jano responded to inquiries from
Texas physicians by mailing them insurance information that failed to mention the Companies
were not authorized to sell insurance in Texas, and, in fact, had been expressly forbidden from
doing so by the Board until they obtained a certificate of authority. 

 Jano relies in part on the supreme court's statement that "[a]bsent some allegation
of a specific act in Texas, or one with reasonably foreseeable consequences within this state's
borders, a nonresident employee of a foreign corporation cannot be sued in Texas simply because
his or her employer solicits business here." Siskind v. Villa Found. for Educ., Inc., 642 S.W.2d
434, 438 (Tex. 1982). By negative implication, the supreme court would allow the exercise of
personal jurisdiction over a defendant if there were allegations of a specific act in Texas or
reasonably foreseeable consequences within the State's borders. See Donovan, 747 F.2d at 973
n.11. The State alleged that Jano, in his individual capacity, (1) "knowingly participated in
making material misrepresentations and omissions of facts to Texas residents," (2) "knowingly
participated, represented, effectuated and aided" the Companies in engaging in eight unauthorized
insurance practices, and (3) used CARIB's and Trans-Pacific's fictitious corporate status as a sham
to perpetrate fraud upon Texas insureds, to evade legal obligations and to circumvent Texas
statutes. We believe these allegations fall within the exception implied by Siskind. 

 Moreover, the court in Siskind noted that the plaintiff in that case had not alleged
specific acts of misrepresentation by the individual defendants, or that the corporation was merely
an alter ego of the individuals. The State alleged in the case at bar that Jano made
misrepresentations to Texas policyholders and that the Companies were the alter ego of Jano. 
Finally, Siskind preceded Calder, which expanded the states' ability to exercise jurisdiction over
nonresident employees within constitutional limits.

 We conclude Jano's representative capacity fails to shield him from the State's
exercise of jurisdiction over him. See General Elec. Co. v. Brown & Ross Int'l Distribs., Inc.,
804 S.W.2d 527, 533 (Tex. App. 1990, writ denied). We turn then to the question whether
jurisdiction was proper based on Jano's own activities.



Jurisdiction over Nonresident


 "A Texas court may exercise jurisdiction over a nonresident if two conditions are
met. First, the Texas long-arm statute must authorize the exercise of jurisdiction. Second, the
exercise of jurisdiction must be consistent with federal and state constitutional guarantees of due
process." Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990).

 The Texas long-arm statute authorizes the exercise of jurisdiction when a
nonresident does business in Texas. Id. In addition to other acts that may constitute doing
business, a nonresident does business in Texas if the nonresident "contracts by mail or otherwise
with a Texas resident and either party is to perform the contract in whole or in part in [Texas]." 
Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1) (1986). In this connection, the following
evidence was adduced.

 When a physician called the Companies' Washington, D.C. office to request
information about insurance, Jano himself talked to the physician. Pursuant to the physician's
request, Jano sent information about the Companies' insurance policies; the information failed to
disclose, however, that the Companies were selling insurance illegally in Texas, and Jano did not
supply that information over the telephone. (5) Those physicians who wished to purchase insurance
coverage completed the applications and mailed them back to the Companies' office. Jano
executed the insurance contracts in either Washington or Micronesia. The physicians, of course,
were obliged by contract to mail premium payments to the Companies in order to retain liability
coverage. We believe this arrangement constituted "doing business" within the meaning of the
long-arm statute. See id.; see also Tex. Ins. Code Ann. art. 1.14-1, § 2(a) (Supp. 1992)
(providing that the making of an insurance contract by mail or the taking or receiving of an
application for insurance by mail constitutes "doing an insurance business" in Texas). 

 Even if the foregoing is not sufficient to constitute "doing business" on the part of
Jano individually, we believe his careful attempts to sell insurance within Texas without bringing
himself under the State's regulatory authority did constitute "doing business." See id. § 2(9)
(providing that a person "does business" by the "doing or proposing to do any insurance business
in substance equivalent to any [of the other provisions of art. 1.14-1] in a manner designed to
evade the provisions of the statutes").

 We next determine whether the exercise of jurisdiction comports with federal due
process guarantees. See Schlobohm, 784 S.W.2d at 357 (the broad language of the long-arm
statute's doing-business requirement allows the statute to reach as far as the federal constitution
permits). Combining requirements gleaned from federal precedents, the Supreme Court of Texas
has suggested a tripartite formula to determine whether a nonresident is subject to the jurisdiction
of Texas courts:



(1) The nonresident defendant or foreign corporation must purposefully do
some act or consummate some transaction in the forum state (the "minimum
contacts" analysis);


(2) The cause of action must arise from, or be connected with, such act or
transaction. Even if the cause of action does not arise from a specific
contact, jurisdiction may be exercised if the defendant's contacts with
Texas are systematic and continuous; and


(3) The assumption of jurisdiction by the forum state must not offend
traditional notions of fair play and substantial justice.



Id. at 358.

 To determine whether a defendant had minimum contacts, we must focus on his
intentional activities and expectations. In other words, the defendant's purposeful acts, either
within the forum or outside the forum, must justify a conclusion that the defendant should
reasonably anticipate being called into court in the forum. See World-Wide Volkswagen Corp. v.
Woodson, 444 U.S. 286, 297 (1980). We believe Jano had sufficient minimum contacts with the
State of Texas. Knowing the Companies had no certificate of authority to sell insurance in Texas,
Jano sent insurance information and applications to Texas physicians and executed the applications
when the physicians returned them. Jano conceded that the patients of the Companies'
policyholders would likely sue in Texas courts and the Companies would have to defend in Texas
courts. Jano also sent the Companies' Texas policyholders a letter promising them a chance to
win a Caribbean vacation if they would solicit other physicians to submit insurance applications
to the Companies; in other words, Jano's letter requested the policyholders to act as agents of the
Companies to sell insurance policies to other physicians. We conclude Jano purposefully directed
his activities into this forum. See Guardian Royal Exch. Assurance, Ltd. v. English China Clays,
Inc., 815 S.W.2d 223, 232 (Tex. 1991) (concluding that insurer established minimum contacts
in Texas); see also Micromedia v. Automated Broadcast Controls, 799 F.2d 230, 233-34 (5th Cir.
1986) (finding nonresident corporation had minimum contacts because of (1) telephone calls
between Texas resident and corporate representative and (2) existence of contract between Texas
resident and nonresident corporation); General Elec. Corp., 804 S.W.2d at 531 (finding
nonresident corporation had minimum contacts because it expected to profit from its activities in
Texas and received a benefit from Texas residents); cf. Zac Smith & Co. v. Otis Elevator Co., 734
S.W.2d 662, 665-66 (1987), cert. denied, 484 U.S. 1063 (1988). 

 Moreover, Jano continued to execute policies for Texas physicians after the
Companies received cease-and-desist orders from the Board. He therefore should reasonably have
anticipated the call to a Texas court. See General Elec. Corp., 804 S.W.2d at 532 (holding that
corporate president was subject to Texas court's jurisdiction because, by participating in a scheme
to defraud Texas customers, he should have anticipated a call to Texas courts); Beechem v.
Pippen, 686 S.W.2d 356, 359 (Tex. App. 1985, no writ) ("Multiple contacts with the state
increase the likelihood that a litigant could foresee the possibility of one day having to defend his
conduct there."); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985);
Schlobohm, 784 S.W.2d at 350.

 Second, the court below had specific jurisdiction over Jano because the cause of
action arises from his transactions. The State brought this action precisely because Jano attempted
to sell insurance in Texas without authorization. We conclude the court had general jurisdiction
over Jano as well. The State alleged the Companies issued at least 187 policies to Texas
physicians; Jano estimated the Companies issued between seventy and eighty policies in Texas. 
Whichever number is correct, we believe Jano's contacts were systematic and continuous.

 Third, we must determine whether the exercise of jurisdiction over Jano comports
with fair play and substantial justice. In making this determination, we consider the following: 



(1) the burden on the defendant; (2) the interest of the forum state in adjudicating
the dispute (including the state's special regulatory interest in areas such as
insurance); (3) the plaintiff's interest in obtaining convenient and effective relief;
(4) the interstate judicial system's interest in obtaining the most efficient resolution
of controversies; and (5) the shared interest of the several states in furthering
substantive social policies.



Guardian Royal Exch. Assurance, Ltd., 815 S.W.2d at 231. After a careful analysis of these
factors, we conclude the court's exercise of jurisdiction over Jano comports with fair play and
substantial justice. The State of Texas unquestionably has an interest in adjudicating the dispute
because of its "special regulatory interest in areas such as insurance." Id. Although the exercise
of jurisdiction may impose a burden on Jano, we believe the quality, nature and extent of his
activities directed toward Texas residents justify the exercise of jurisdiction. Nothing in the
record suggests litigation in a Texas court would be excessively burdensome or inconvenient to
him. See id. ("[D]istance alone ordinarily [is not] sufficient to defeat jurisdiction: `modern
transportation and communication have made it much less burdensome for a party sued to defend
himself in a State where he engages in economic activity.'") (quoting McGee v. International Life
Ins. Co., 355 U.S. 220, 223 (1957)). Moreover, because one of the parties is the State of Texas
and because virtually all the Texas policyholders reside within the state, litigation would probably
be more convenient and efficient in Texas than it would be elsewhere.

 We hold that the exercise of jurisdiction over Jano by the court below satisfied due
process requirements. We overrule Jano's first point of error.



Federal Preemption


 In his second point of error, Jano contends the trial court erred in applying the
Texas Insurance Code to him because the McCarran-Ferguson Act preempts such regulations. 
See 15 U.S.C. §§ 1011-1015 (1988). In effect, Jano contends the McCarran-Ferguson Act limits
the scope of state regulation, so the provisions of Insurance Code article 1.14-1 defining what
constitutes "doing business" cannot be applied to him. According to Jano, the Insurance Code
allows the State to extend its regulatory reach beyond that provided for by Congress; therefore,
the State lacks jurisdiction to impose the penalties assessed against him.

 On its face, the McCarran-Ferguson Act appears to confer on states the right to
regulate the insurance business rather than to limit that right. (6) Jano argues, nevertheless, that the
Supreme Court limited the scope of a state's right to regulate insurance in State Board of
Insurance v. Todd Shipyards Corp., 370 U.S. 451 (1962). 

 In Todd Shipyards the Supreme Court held unconstitutional a Texas statute
imposing a tax on insureds who purchased liability coverage from insurers not licensed to sell
insurance in Texas. Looking at the legislative history of the McCarran-Ferguson Act, the Court
determined that Congress intended for the Act to comply with previous Supreme Court decisions
holding that "a State does not have the power to tax contracts of insurance or reinsurance entered
into outside its jurisdiction by individuals or corporations resident or domiciled therein covering
risks within the State or to regulate such transactions in any way." Id. at 624 (quoting H.R. Rep.
No. 143, 79th Cong., 1st Sess., pt. 3 (1945)). Jano asserts that this decision prohibits the State
of Texas from regulating the insurance transactions between the Companies and Texas physicians. 
We disagree.

 Todd Shipyards is distinguishable from the case at bar. In Todd Shipyards, the
transactions in question took place entirely outside Texas: the contracts were negotiated and paid
for outside Texas; the policies were issued outside Texas; and the losses arising under the policies
were adjusted and paid outside Texas. Moreover, the insurers were not licensed to do business
in Texas, had no office or place of business in Texas, did not solicit business in Texas, had no
agents in Texas and did not investigate claims in Texas. Id. at 623. The only connection with
Texas was that the insured property was physically located in Texas. In contrast, Jano sent
insurance information to Texas residents, negotiated contracts with Texas residents, received
payment from Texas residents, and requested Texas residents to solicit business for the
Companies. Further, had claims arisen on the policies, the Companies would have had to
investigate, litigate and pay claims in Texas. We do not believe Todd Shipyards bars the State
from imposing its regulations on Jano and the Companies.

 Finally, Jano argues that, by its own terms, article 1.14-1 of the Insurance Code
excludes him from its scope of regulation. Article 1.14-1 specifies the acts which constitute
"doing an insurance business in the state." Maintaining that he did not do an insurance business,
Jano relies on the regulation exclusion set forth in section 2(b) of article 1.14-1: "The provisions
of this section do not apply to: . . . Transactions involving contracts of insurance independently
procured through negotiations occurring entirely outside of this state which are reported and on
which premium tax is paid in accordance with this Article." Tex. Ins. Code Ann. art. 1.14-1,
§ 2(b) (Supp. 1992). We conclude this provision is inapplicable. The insureds were in Texas at
the time they negotiated their contracts of insurance. Therefore, the negotiations did not occur
entirely outside of the state. We overrule Jano's second point of error.



Sanctions for Discovery Abuse


 When the Companies and Jano refused to comply with discovery orders, the trial
court struck their pleadings and entered a default judgment against them. See Tex. R. Civ. P.
Ann. 215(3) (Supp. 1992). In his third point of error, Jano contends the trial court erred by
assessing the discovery sanctions. Jano maintains that he and the Companies provided to the State
the requested discovery, except for information about the location and amount of the Companies'
assets; they withheld information about their assets only "because actions of the State of Texas
show that [the State] would use such information in order to locate and attach assets to cover the
bond imposed on the Defendants prior to their answering this suit." 

 The imposition of sanctions lies within the sound discretion of the trial court. 
TransAmerican Natural Gas Corp. v. Powell, 811 S.W.2d 913, 917 (Tex. 1991). The supreme
court, however, has prescribed the factors to be considered in exercising that discretion. First,
a direct relationship must exist between the offensive conduct and the sanction imposed; that is,
the sanction must be directed against the abuse and must be imposed upon the offending party. 
Id. Second, the sanctions must not be excessive. "A sanction imposed for discovery abuse should
be no more severe than necessary to satisfy its legitimate purposes." Id. Third, the imposition
of sanctions must not offend constitutional due process rights. Id.

 We conclude the sanctions assessed below survive even the heightened scrutiny
mandated by TransAmerican. See id. at 918 ("Sanctions which are so severe as to preclude
presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or
counsel's callous disregard for the responsibilities of discovery under the rules."). The
Companies and Jano ignored several court orders to appear for depositions and to produce
documents and other discovery information. We believe the following sequence of events
demonstrates a pattern of discovery abuse justifying the sanctions imposed.

 First court order--In response to the State's January 11, 1990, motion for expedited
discovery, the trial court ordered the Companies' corporate representatives to appear for
depositions on January 22, 1990. The court also ordered the representatives to produce at that
time certain requested documents and answers to interrogatories. Neither Jano nor any other
representative of the Companies appeared for the deposition or produced the documents or
answers to interrogatories. 

 Second court order--On February 27, 1990, the State filed a "motion to compel and
for sanctions," complaining that Jano and the Companies had disobeyed the previous order to
appear. On March 26, 1990, the trial court granted the motion to compel, ordering Jano and
other corporate representatives to appear for depositions and ordering the Companies to produce
certain requested documents and answers. The court denied the motion for sanctions. No one
representing the Companies appeared for deposition, but the Companies apparently did produce
some, though not all, of the requested documents.

 Third court order--On May 31, 1990, the State filed its second "motion to compel
and for sanctions," alleging the Companies withheld pertinent documents and altered some of the
documents they did produce. The State requested the court to strike the Companies' pleadings
as a sanction for discovery abuse. Before the June 4 hearing on the motion, the Companies filed
a motion to stay discovery on the ground that they had filed a petition for leave to file a writ of
mandamus. The trial court granted the Companies' motion. After the State filed its motion to
reconsider the stay order, the trial court allowed discovery to resume as to all issues relevant to
the defendants' special appearances. In September 1990 Jano appeared for deposition but limited
his answers to matters involving jurisdiction.

 Fourth court order--After the trial court overruled the defendants' special
appearances, the State gave Jano notice that it would depose him on September 27, 1990. Jano
failed to appear for his deposition; he also ignored the October 2 show-cause hearing on the
State's motion for contempt. The court ordered Jano to appear for deposition, set another
contempt hearing for October 19, and issued a writ of attachment for his arrest. Jano obtained
a postponement of that hearing until April 1991 because he had to return to Micronesia following
his father's death.

 Fifth court order--On October 19, 1990, the State filed still another "motion to
compel and for sanctions," asking the court to strike for discovery abuse the defendants'
pleadings. The court ordered the defendants to produce all requested documents and questions
propounded to them. The court also ordered Jano and other corporate representatives to appear
for deposition on or before November 12, 1990.

 Sixth court order--On November 21, 1990, the State filed its final "motion to compel
and for sanctions." In its motion the State complained that the defendants had not complied with
the October 19 order because they (1) produced no answers to interrogatories, (2) produced no
documents in response to requests for production, (3) produced few documents pertinent to their
financial circumstances or to their Texas policies, and (4) produced corporate representatives who
either knew little about the Companies' affairs or refused to answer specific, relevant questions. 
Despite the October 26 order, Jano never appeared for deposition. On November 28, 1990, the
trial court granted the State's motion for sanctions and struck the defendants' pleadings for
discovery abuse. The court then rendered a default judgment against CARIB, Trans-Pacific and
Jano as to all causes of action.

 Considering the foregoing sequence, we cannot say the trial court abused its
discretion by striking Jano's pleadings. First, the court visited the sanction upon the offender
himself; Jano ignored the State's repeated attempts to depose him, even after the trial court
overruled his special appearance. Second, the pattern of abuse demonstrated that lesser sanctions
were ineffectual. After Jano defied a court order by continuing to execute insurance policies
following a cease-and-desist order and by failing to deposit monies in the registry of the court,
the court issued a writ of attachment commanding peace officers to bring Jano before the court
to show why he should not be held in contempt. Although Jano appeared through counsel and
obtained a continuance of the contempt hearing, he again failed to respond to the October 26 order
that he appear for deposition. The trial court could reasonably have concluded that Jano's
indifference to the court's orders indicated that lesser sanctions would be ineffective to compel
him to appear for deposition.

 The defendants' hindrance of the discovery process was egregious enough to justify
a presumption that their defenses lacked merit and that they acted in bad faith. See id. In contrast
to the discovery abuse in TransAmerican, in which a corporate representative failed to appear for
his deposition one time, the defendants in the instant case engaged in a pattern of discovery abuse. 
Cf. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 240-41 (Tex. 1985).

 The defendants contend they could not comply with discovery orders because
disclosure of the location and amount of their assets would expose those assets to the threat of
seizure by the State. Assuming their concern was justified, their remedy was not to ignore
discovery orders; rather, they should have filed a motion for a protective order. See Axelson, Inc.
v. McIlhany, 798 S.W.2d 550, 553 (Tex. 1990). Moreover, we note that the defendants resisted
discovery requests that did not inquire about financial information.

 The trial court was within its discretion to strike the defendants' pleadings. See
TransAmerican Natural Gas, 811 S.W.2d at 918 ("[I]f a party refuses to produce material
evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim
or defense lacks merit and dispose of it."). We overrule Jano's third point of error.



Amount of Civil Penalties


 In his fourth point of error, Jano contends the trial court erred by assessing against
the defendants civil penalties and restitution damages in excess of what the evidence proved. The
trial court ordered the Companies to pay $1,142,887 in restitution damages and $1,000,000 in
civil penalties. The court also assessed a $100,000 civil penalty against Jano individually. 
Because the Companies have obtained a dismissal of their appeal, we address the sufficiency of
the evidence only as to Jano's penalty.

 Nothing in the record reveals how the trial court arrived at the amount of the
penalty. Because Jano requested no findings of fact, however, we must assume the court made
all the necessary findings to support its judgment. Roberson v. Robinson, 768 S.W.2d 280, 281
(Tex. 1989). Jano may attack these implied findings by a factual-sufficiency point the same as
if he had requested findings of fact. Id. When reviewing a complaint that the evidence is
insufficient to support a trial-court finding, we consider and weigh all the evidence, and we
reverse the judgment only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 The trial court justified its assessment of civil penalties against Jano by citing
section 3(d) of Insurance Code article 1.14-1, which provides for a penalty "of not more than
$10,000 for each act of violation and for each day of violation" of any provision of article 1.14-1. 
Tex. Ins. Code Ann. art. 1.14-1, § 3(d) (Supp. 1992). Because the court assessed a $100,000
penalty against Jano, the evidence must support a finding that Jano engaged in ten acts of
unauthorized insurance or violated the insurance laws for ten days, or engaged in some
combination of the two. We conclude the evidence is sufficient to support such a finding. Jano
supplied insurance information to Texas physicians without informing them the Companies could
not lawfully sell insurance in Texas, and he received and executed dozens of contracts procured
through that misrepresentation. Moreover, these policies remained in effect for months or years. 
We believe these acts provide sufficient evidence to support the assessment of penalties against
Jano in his individual capacity. We overrule Jano's fourth point of error.



Propriety of Permanent Injunction


 The final judgment ordered Jano and seven other persons to surrender to the State
all "books, documents, and records, including without limitation any and all policies and records
of premiums and/or other remuneration, related or connected, directly or indirectly, to the
business of [CARIB and Trans-Pacific] in the State of Texas." In his fifth point of error, Jano
contends the trial court erred by rendering a judgment that enjoined persons "who were not parties
to this action and not subject to the jurisdiction of the court." The seven individuals named in the
judgment were apparently officers of the Companies or attorneys who represented the Companies
at one time or another.

 Although Jano is within his rights to contest the trial court's exercise of jurisdiction
over him, we believe he lacks standing to assert the rights of the remaining seven persons named
in the judgment. See Carlton v. Dierks, 203 S.W.2d 552, 557 (Tex. Civ. App. 1947, writ ref'd
n.r.e.) (holding that appellant had no standing to contest injunction binding his successors in title
because the injunction did not infringe upon his own rights; successors in title could assert rights
whenever enforcement was sought against them). A party "may not complain of errors which do
not injuriously affect him or which merely affect the rights of others." Jackson v. Fontaine's
Clinics, Inc., 499 S.W.2d 87, 92 (Tex. 1973); Ferguson v. DRG/Colony North, Ltd., 764 S.W.2d
874, 885 (Tex. App. 1989, writ denied). We overrule Jano's fifth point of error.

 Finding no error, we affirm the trial-court judgment in all respects.




 John Powers, Justice

[Before Justices Powers, Jones and Kidd]

Affirmed

Filed: August 26, 1992

[Do Not Publish]
1. Because CARIB refused to surrender its financial records for examination in 1989, the
Guam Department of Revenue and Taxation refused to renew CARIB's certificate of authority
to issue insurance policies. The Department ordered CARIB to cease and desist from
soliciting new insurance policies or renewing existing policies. To continue its insurance
business, CARIB reincorporated in August 1989 in the Federated States of Micronesia under
the name Trans-Pacific Insurance Company. Trans-Pacific's shareholders and board of
directors were identical to those of CARIB. 
2. We will refer to CARIB and Trans-Pacific collectively as "the Companies," except when
a distinction between the entities is necessary. When we refer to "the defendants," we include
Jano along with CARIB and Trans-Pacific.

3. On August 29, 1990, this Court submitted and overruled the Companies' and Jano's
motion for leave to file a petition for writ of mandamus.
4. In their brief on appeal, the Companies and Jano raised seven points of error. Counsel
for Jano conceded in oral argument, however, that this Court need not address the point of
error concerning whether Texas has in personam jurisdiction over CARIB and Trans-Pacific. 
Nor need we address the Companies' point of error complaining of the district court's order
that they post a bond before receiving a trial on the merits. Therefore, we will address only
the five points of error pertinent to Jano's appeal.
5. Jano almost certainly knew that he acted unlawfully by executing contracts binding
Texas residents. In a letter dated January 28, 1988, a CARIB vice-president wrote to the
Board:


 [O]ur Company did not realize that we were not complying with
your State's requirements and we will cease doing further
business in your fine State until we can apply accordingly. . . . 
Further, after receipt of this letter, I would request that you close
your file accordingly until such time as we are able to meet the
necessary requirements for your fine State.


Although Jano did not write this letter, he testified he was responsible for making sure that the
Companies' policies complied with each state's applicable law. Neither of the Companies ever
re-applied for or obtained a certificate of authority to sell insurance in Texas. 
6. See 15 U.S.C. § 1012(a) (1988) ("The business of insurance, and every person engaged
therein, shall be subject to the laws of the several States which relate to the regulation or
taxation of such business."); see also id. § 1011 ("Congress declares that the continued
regulation and taxation by the several States of the business of insurance is in the public
interest, and that silence on the part of the Congress shall not be construed to impose any
barrier to the regulation or taxation of such business by the several States.").